UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARTNER, INC., Plaintiff, v. JEFFREY P. RUMBURG, Defendant. | CIVIL ACTION NO. APRIL 10, 2007 |

## VERIFIED COMPLAINT

Plaintiff, Gartner, Inc. ("Gartner"), through its counsel, for its complaint against the defendant Jeffrey P. Rumburg ("Rumburg"), alleges as follows:

## INTRODUCTION

1. This is an action brought by Gartner for damages and equitable relief caused by the unlawful conduct of its former highly compensated executive, Jeffrey Rumburg. In violation of his employment agreement with Gartner, Rumburg is competing directly with Gartner in the benchmarking market – a market in which Rumburg will perform the same services for clients as he did for Gartner. Rumburg's actions thus constitute breach of contract, trade secret misappropriation and unfair and deceptive trade practices.

## THE PARTIES

2. The plaintiff, Gartner, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Stamford, Connecticut.

3. The defendant, Jeffrey P. Rumburg, is an individual residing at 1431 Mayhurst Blvd., McLean, Virginia 22301.

## JURISDICTION AND VENUE

4. Jurisdiction exists in this Court based on complete diversity of citizenship between the parties and because the value of the rights of the plaintiff implicated by the conduct alleged herein and the actual and potential loss to the plaintiff as a result of the defendant's unlawful conduct exceed $75,000, exclusive of interest and costs, pursuant to 28 U.S.C. § 1332.

5. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of the property that is the subject of this action is situated in Connecticut, and because the parties have expressly consented to the jurisdiction of the federal courts located in the state of Connecticut.

## GARTNER'S BUSINESS

6. Gartner is the leading global provider of research and analysis in the information technology ("IT") industry. Gartner's principal business segments include research, consulting, executive programs and events.

7. Gartner's Consulting group includes Benchmarking Solutions, which provides customized benchmarking solutions generated from the world's largest database of IT performance metrics.

8. The Benchmarking Solutions program offers products to aid in optimizing clients' effectiveness, efficiency, service delivery and performance.

9. Gartner assesses each client's IT services, and applies detailed benchmarks and analyses to those service areas most likely to present targets for improvement. Benchmarks are designed and focused on each client's specific needs, using high-level or detailed metrics, to ensure each client has information targeting their specific requirements.

## GARTNER'S AGREEMENT REGARDING CERTAIN CONDITIONS OF EMPLOYMENT

10. In consideration of their employment with Gartner, every employee is required to execute an Agreement Regarding Certain Conditions of Employment (the "Agreement"). A copy of the Agreement executed by Rumburg is attached hereto, and incorporated herein by reference, as Exhibit A.

11. The Agreement contains an assignment of inventions covenant in Section 4, which states in relevant part:

> 4. Assignment of inventions.
>
> (d) The Employee agrees that during the Employment and for one year following termination, for any reason, the Employee will provide the Employer, for the Employer's review and approval, at least 15 days prior to submission, a copy of any article or contribution written by or created by the Employee for publication, whether singly or jointly with others, which article for contribution discusses or makes reference to any subject pertaining to the Employer or its business.

12. The Agreement contains a non-competition/non-solicitation covenant in Section 5, which states in relevant part:

> 5. Non-Competition.
>
> (a) Definitions. The following terms shall have the meanings given them below:
>
> (i) Competitive Acts shall mean the development, marketing or selling of—or assisting others to develop, market or sell—a product or service which is competitive with the products or services of the Employer (both those existing during the Employment and those which are planned for the future and of which the Employee learns during the Employment), and the solicitation, directly or indirectly, of the Employer's clients or known prospects for the purposes of developing, marketing or selling such products or services, by the Employee (whether as a consultant, analyst, sales person, independent contractor, independent business venturer, partner, member, employee or otherwise).
>
> (ii) Non-Compete Area shall mean any location within a fifty (50) mile radius of the principal office in which the Employee worked at any time during the one year period prior to the termination of the Employment. If the Employee's principal office was in Stamford, Connecticut at any time during the one year period prior to the termination of the Employment, then the Non-Compete Area shall be defined as any location within (A) a fifty (50) mile radius of Stamford, Connecticut, and (B) the states of Connecticut, New York and Massachusetts.
>
> (b) Non-Competition.
>
> ....
>
> (iii) Other Positions. The Employee agrees that, for a period of one year following the termination of the Employment for any reason, the Employee will not: (A) engage in any Competitive Acts; (B) engage in any Competitive Acts with any entity or individual to whom the Employee submitted proposals for specific services on behalf of the Employer within one year prior to termination of Employment; or (C) engage in any Competitive Acts within the Non-Compete Area.

13. Section 7 of the Agreement provides that Gartner is entitled to immediately obtain and enforce an injunction prohibiting any employee from violating any terms of the Agreement.

14. Section 11 of the Agreement contains a choice of law and forum selection clause pursuant to which the parties have consented to the application of Connecticut law and the jurisdiction of the federal courts in Connecticut. That section states:

> This Agreement and the rights of the parties shall be governed by and construed in accordance with the laws of the state of Connecticut without regard to its conflict of laws principles. Each of the parties consents in advance to the jurisdiction of the appropriate state or federal courts located within the state of Connecticut.

15. In connection with his employment by Gartner, Rumburg validly executed the Agreement on or about March 10, 2005.

## GARTNER'S PROPRIETARY AND CONFIDENTIAL INFORMATION

16. Gartner has developed and uses a wide variety of proprietary, confidential and trade secret information including, but not limited to, financial information, product and service costs, prices, business strategies, product and service plans, marketing plans and studies, forecasts, computer programs, databases (and documentation and information contained in the databases), computer access codes, know-how, technologies, records, vendor relationships, business relationships, client lists (including identities of clients and prospective clients, identities of individual contacts of business entities which are clients or prospective clients, client spending preferences, businesses or habits), subscription or consultant

termination dates, and other confidential or propriety information that has not been made available to the general public ("Confidential Information").

17. Gartner's Confidential Information is crucial to Gartner as it enables the Company to compete in the marketplace effectively.

18. The Confidential Information is made up of Gartner's trade secrets in that:

(a) The Confidential Information is not known by others outside of Gartner;

(b) Gartner limits its own employees' access to the Confidential Information;

(c) Gartner has taken reasonable steps to guard the secrecy of the Confidential Information;

(d) The Confidential Information is extremely valuable to Gartner in providing it with a competitive advantage over its competitors, and it would be extremely valuable to its competitors;

(e) Gartner has invested a vast amount of time and money on marketing, advertising, telemarketing, attending trade shows and conducting seminars to develop and compile the Confidential Information; and

(f) It would be virtually impossible for the Confidential Information to be properly acquired or duplicated by others.

19. Gartner employees have access to the Company's Confidential Information in order to perform their job responsibilities.

20. Gartner employees are given a specific log-on name and password to provide entry into the computer system on the Company's local area network. By password protecting

the computer system, Gartner guards against unauthorized access to its vital, valuable and confidential information.

21. When a Gartner employee receives a log-on name and password to the computer, he/she knows that access to the information stored in the computer system is confidential and is not to be disclosed to unauthorized persons.

22. Gartner employees are expressly instructed that they are not permitted to disclose any of the Company's Confidential Information to anyone outside the Company or use Confidential Information other than for Company business. Gartner employees are also instructed not to remove any Confidential Information from the work premises unless authorized to do so.

23. In addition, Gartner employees are instructed that they are not to take any materials containing Confidential Information with them upon termination from the Company. Gartner's policies regarding its confidential, propriety and trade secret information are also set forth in the Company's Code of Conduct Policy, which is available to Gartner employees on the Company's intranet.

24. The Agreement also contains covenants and representations regarding Gartner's Confidential Information. In the Agreement, each Gartner employee acknowledges that the Company's confidential information includes items such as financial information, product and service costs, prices, business strategies, product and service plans, marketing plans and studies, forecasts, computer programs, databases (and documentation and information contained in the databases), computer access codes, know-how, technologies, records, business relationships, client lists (including identities of clients and prospective clients, identities of

individual contacts of business entities which are clients or prospective clients, client spending preferences, businesses or habits), subscription or consultant termination dates, and other confidential or propriety information that has not been made available to the general public.

25. Pursuant to the Agreement, Gartner employees further acknowledge that all information related to the operation of Gartner's business is confidential and consists of trade secrets of Gartner and that all such assets shall remain the property and trade secrets of Gartner and that the disclosure of any of these assets would cause irreparable harm to Gartner.

26. Pursuant to Section 1 of the Agreement, Gartner employees agree not to use or disclose any of Gartner's Confidential Information other than solely in the furtherance of the Company's business and to take all lawful measures to prevent the unauthorized use or disclosure of the Confidential Information to any third party and to take all lawful measures to prevent unauthorized persons or entities from obtaining or using the Confidential Information and not to take any actions which would constitute or facilitate the unauthorized use or disclosure of Confidential Information.

27. The Agreement further provides that a Gartner employee will not remove from the Company's offices any books, records, documents or any information which can be stored in or retrieved from a computer and that the employee will deliver to the company all confidential materials in the employee's possession or control upon termination of employment.

**RUMBURG'S EMPLOYMENT WITH GARTNER**

28. Prior to joining Gartner, Rumburg was previously a Vice President with META Group, Inc. ("META").

29. While at META, Rumburg became familiar with Metricnet, a benchmark service founded by Howard Rubin ("Rubin"). META subsequently purchased the rights to Metricnet from Rubin.

30. Rubin and Rumburg were employed by META when Gartner acquired the company in April, 2005.

31. As part of the META acquisition, Gartner made Rumburg an offer of employment. On or about April 5, 2005, Rumburg accepted a written offer of employment from Gartner (the "Employment Offer").

32. Pursuant to the Employment Offer, Rumburg became a highly compensated executive, and held the position of Vice President, North America Consulting East. During his employment, Rumburg specialized in Gartner's call center benchmarking products.

33. In his capacity as Vice President, Rumburg was responsible for leading Gartner engagements, selling Gartner engagements, fostering and building client relationships, and acting as a leading practitioner in the benchmarking area.

34. Through his work as Vice President, Rumburg had access and exposure to Benchmarking Solutions' Confidential Information and trade secrets, including, among other things, the Gartner Worldwide IT Benchmark service (WWB), a real-time, comprehensive data resource designed to provide clients with key cost and performance indicators by IT domain and focused high-level comparisons.

35. In or about July, 2006, David Howe ("Howe"), Gartner's GVP, who was then responsible for Gartner's global consulting solutions, including benchmarking, and who works out of Gartner's headquarters in Stamford, Connecticut, asked Rumburg to join a special

Gartner working team. This special team was engaged on an internal project designed to reengineer Gartner's global benchmarking product suite (the "Reengineering Project").

36. The Reengineering Project, led by Howe, was tasked with redesigning and improving benchmarking deliverables, creating consistency in the tools being utilized by the benchmarking group, and creating uniform project management guidelines for use by the Benchmarking Solutions group.

37. As part of the Reengineering Project team, Rumburg helped create new methodologies, outputs, deliverables, analytics, logic, and guideposts for the Gartner Benchmarking Solutions group.

38. As such, Rumburg was on the leading edge of Gartner's front line thinking with regard to the benchmarking market and Gartner's benchmarking strategies.

## RUMBURG'S DEPARTURE FROM GARTNER

39. On or about October 13, 2006, Rumburg unexpectedly resigned from his employment with Gartner, and gave two weeks notice of his resignation.

40. Upon receiving Rumburg's notice of resignation, Rumburg's manager, Howe, attempted to persuade Rumburg to remain with the company. At a minimum Howe asked Rumburg to stay until the Reengineering Project was complete. Rumburg considered Gartner's request but eventually declined and reiterated his decision to leave the company to Howe.

41. Howe asked Rumburg about his future employment plans and specifically, whether or not he was planning on joining a Gartner competitor.

42. Rumburg responded to Howe that he wanted a "change of direction," and that he would be doing something "fundamentally different" after leaving Gartner.

43. Howe reminded Rumburg of his post employment obligations to Gartner contained in the Agreement.

44. In response, Rumburg told Howe that he understood his post employment obligations to Gartner. Rumburg also told Howe that although he was not sure of exactly what he was going to do after leaving Gartner, he was sure that it would not be anything "for Gartner to worry about."

45. Rumburg's statements to Howe were fundamentally false in that he planned to become a direct competitor to Gartner in at least a portion of its benchmarking business.

## RUMBURG COMPETES WITH GARTNER

46. Upon information and belief, in or about December, 2006, Rumburg formed MetricNet, LLC ("MetricNet"), a Virginia corporation with its principal place of business in McLean, Virginia. Rumburg is a co-founder and Managing Partner of MetricNet.

47. Rumburg is providing industry-specific and customized benchmarking programs apparently centered in the call center area.

48. Rumburg's benchmarking programs compete directly with Gartner's Benchmarking Solutions in the benchmarking market.

49. Rumburg's benchmark program appears to mimic several key components of Gartner's Worldwide IT Benchmark for Contact Centers, which Rumburg was exposed to and

became familiar with during his tenure as Vice President in the Benchmarking Solutions Group.

50. Specifically, Rumburg's program for Energy Utilities includes:

(a) more than 30 key performance indicators;

(b) a comprehensive salary survey for key positions in the industry; and

(c) a customized balanced scorecard.

51. Rumburg has co-authored and published an article, *How Does Your Call Center Stack Up?*, in Call Center Magazine, on February 7, 2007.

52. Rumburg's article is linked to MetricNet's website, and discusses the merits of call center benchmarking.

53. Upon information and belief, Rumburg purchased a mailing list from Call Center Magazine to promote his new company. Call Center Magazine mistakenly sent the invoice for the mailing list to Rubin care of his former company - MetricNet. Call Center Magazine was confused by Rumburg's use of Rubin's company's name for his new venture.

**COUNT ONE:** **(Breach of Non-Competition/Non-Solicitation Agreement)**

54. Paragraphs 1 through 53, above, are repeated and re-alleged as if fully set forth herein.

55. Rumburg is developing, marketing and selling products and/or services that are directly competitive with Gartner's products and services in breach of the Agreement.

56. By developing, marketing, and selling the Contact Center Performance Benchmark for Energy Utilities, Rumburg has breached the non-compete provisions of the Agreement.

57. Upon information and belief, Rumburg has solicited, or intends to solicit, Gartner clients or known prospects for the purpose of marketing and/or selling the Contact Center Performance Benchmark.

58. By soliciting Gartner clients, Rumburg has or will breach the non-solicitation provisions of the Agreement.

59. Upon information and belief, Rumburg is trading on the goodwill and reputation of the Metricnet name, which is owned by Gartner.

60. Rumburg's actions have caused and will continue to cause irreparable harm and other damages to Gartner to an extent currently undetermined.

**COUNT TWO: (Breach of Confidentiality/Non-Disclosure Agreement)**

61. Paragraphs 1 through 60, above, are repeated and re-alleged as if fully set forth herein.

62. In his capacity as Vice President, Benchmarking Solutions, and his work on the Reengineering Project, Rumburg was exposed to Gartner's highly confidential and proprietary business plans and other Confidential Information.

63. Upon information and belief, Rumburg has used and/or disclosed or will inevitably use and/or disclose Gartner's Confidential Information, including, but not limited to

Gartner's Benchmarking Solutions database, client list, marketing plans, pricing strategies and future business development plans.

64. Rumburg's actions were willful and deliberate and have caused and will continue to cause irreparable injury to Gartner for which there is no adequate remedy at law.

65. Rumburg's willful and deliberate actions have breached the express terms of the Agreement including, but not limited to, the confidentiality and non-disclosure covenants contained in Section 1 of the Agreement.

66. Rumburg's actions have caused and will continue to cause irreparable harm and other damages to Gartner to an extent currently undetermined.

**COUNT THREE: (Breach of Assignment of Inventions Agreement)**

67. Paragraphs 1 through 66, above, are repeated and re-alleged as if fully set forth herein.

68. Upon information and belief, Rumburg has co-authored and published an article, *How Does Your Call Center Stack Up?*, in Call Center Magazine, on February 7, 2007.

69. Rumburg's willful and deliberate actions have breached the express terms of the Agreement including, but not limited to, the assignment of inventions covenants contained in Section 4 of the Agreement.

70. In so doing, Rumburg's actions were willful and deliberate and have caused and will continue to cause irreparable injury to Gartner for which there is no adequate remedy at law.

71. Rumburg's actions have caused and will continue to cause irreparable harm and other damages to Gartner to an extent currently undetermined.

**COUNT FOUR: (Misappropriation of Trade Secrets pursuant to Conn. Gen. Stat. §§ 35-50 et seq.)**

72. Paragraphs 1 through 71, above, are repeated and re-alleged as if fully set forth herein.

73. The use and dissemination, and threatened use and dissemination, by Rumburg of Gartner's Confidential Information constitute misappropriation of Gartner's Confidential Information.

74. Rumburg's actions in misappropriating Gartner's confidential, proprietary and trade secret information were willful and malicious and have caused and will continue to cause irreparable injury to Gartner for which there is no adequate remedy at law.

75. Moreover, Rumburg has been unjustly enriched and Gartner has suffered damage as a result of defendant's misappropriation, for which Gartner is entitled to an award of damages pursuant to Conn. Gen. Stat. § 35-53(a).

76. Rumburg's misappropriation was willful and malicious, entitling Gartner to punitive damages and reasonable attorney's fees pursuant to Conn. Gen. Stat. § 35-53(b).

**COUNT FIVE: (Violation of CUTPA, Conn. Gen. Stat. §§ 42-110a et seq.)**

77. Paragraphs 1 through 76, above, are repeated and re-alleged as if fully set forth herein.

78. Gartner is a person within the meaning of Conn. Gen. Stat. §§ 42-110a(3) and 42-110g(a) entitled to bring an action under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq.

79. At all relevant times, defendant was a person acting in the conduct of trade or commerce within the meaning of Conn. Gen. Stat. §§ 42-110a et seq.

80. The foregoing actions of the defendant constitute unfair and deceptive acts and practices in the conduct of trade or commerce that are unethical, unscrupulous and offensive to public policy, and are a violation of Conn. Gen. Stat. § 42-110b(a).

81. As a result of the foregoing unfair and deceptive acts and practices, Gartner has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. §§ 42-110g(a) and has suffered damages in an amount to be determined at trial. Moreover, defendant's foregoing conduct has caused and will continue to cause irreparable injury to Gartner for which Gartner has no adequate remedy at law.

82. The foregoing actions of the defendants show calculated, deceitful and unfair conduct, and reckless indifference to the rights of Gartner. Accordingly, defendant is liable to Gartner for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

83. Gartner is mailing a copy of this Complaint to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut, as required by Conn. Gen. Stat. § 42-110g(c).

**WHEREFORE,** the Plaintiff seeks:

1. A preliminary and permanent injunction enjoining and restraining the defendant, Jeffrey Rumburg:

a. From developing, marketing or selling the Contact Center Performance Benchmark for Energy Utilities;

b. From using directly or indirectly any of Gartner's confidential, proprietary or trade secret information;

c. From disclosing in any manner to anyone any of Gartner's confidential, proprietary or trade secret information;

d. From breaching the terms of the non-competition/non-solicitation covenants contained in the Agreement;

e. From breaching any of the terms of the confidentiality/non-disclosure covenants contained in the Agreement;

f. From breaching any of the terms of the assignment of inventions covenants contained in the Agreement; and

g. Ordering that the defendant, Jeffrey Rumburg, deliver to this Court within seven (7) days of the entry of the preliminary injunction a certification to the Court that he has searched for and turned over, pursuant to the terms of the injunction order, all originals and all copies or derivations made therefrom of documents, forms, computer disks and print-outs containing information regarding Gartner's confidential, proprietary or trade secret information;

2. An Order extending the term of the restrictive covenants contained in that certain Agreement Regarding Certain Conditions of Employment for a period of time equal to the time that Jeffrey Rumburg has been in breach;

3. Monetary damages in such amount as are proven at trial;

4. Punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

5. All damages, including punitive damages, pursuant to Conn. Gen. Stat. § 35-53;

6. Attorney's fees and costs pursuant to Conn. Gen. Stat. §§ 35-53(b), 42-110g(d);

7. Costs;

8. Interest; and

9. Any other such relief at law or in equity that the court deems just and appropriate.

**Jury Demand**

Trial by jury is hereby demanded as to all counts and allegations so demandable.

**PLAINTIFF,**
**GARTNER, INC.**

By: ______________________

Glenn M. Cunningham (Fed. Bar No. ct09995)
Leander A. Dolphin (Fed. Bar No. ct26636)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5218
Email: gcunningham@goodwin.com
Email: ldolphin@goodwin.com
Its Attorneys

462629 v.03 S1

**VERIFICATION**

David Howe duly certifies that he is a GVP of Gartner, he has read the contents of the attached Verified Complaint, he is familiar with the contents therein, and he certifies that the contents of the Verified Complaint are true to the best of his knowledge, information and belief.

David Howe

STATE OF ~~CONNECTICUT~~ MASSACHUSETTS )
) ss.:
COUNTY OF Middlesex )

Subscribed and sworn to before me this 3 day of April 2007.

Notary Public/Commissioner of the Superior Court
My Commission Expires: 11/09/2012

462629 v.02 S2